NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| GEOFFREY M. YOUNG,<br><br>    Plaintiff,<br><br> v.<br><br>STONEX GROUP INC. *et al.*,<br><br>    Defendants. | Civil Action No. 24-00526 (GC) (JTQ)<br><br>**MEMORANDUM OPINION** |

**CASTNER, District Judge**

  **THIS MATTER** comes before the Court upon Defendants StoneX Group, Inc.'s and GAIN Capital Group, LLC's Motion to Dismiss Plaintiff Geoffrey Young's Complaint pursuant to Federal Rule of Civil Procedure (Rule) 12(b)(6).  (ECF No. 17.)  Plaintiff opposed, and Defendants replied.  (ECF Nos. 18, 19).  The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Rule 78 and Local Civil Rule 78.1(b).  For the reasons set forth below, and other good cause shown, Defendants' Motion to Dismiss is **GRANTED**.

## I.  BACKGROUND

### A.  Factual Background[1]

On January 14, 2021, Plaintiff, a resident of Kentucky, opened an individual spot foreign currency trading (forex)[2] account on the website FOREX.com. (ECF No. 1 ¶ 1.) FOREX.com is owned by Defendant GAIN Capital, which has offered trading services for retail investors since 2001. GAIN Capital launched FOREX.com in 2004. (*Id.* ¶ 1.) According to Plaintiff, StoneX Group[3] acquired GAIN Capital in 2020. (*Id.*)

Plaintiff claims that he opened his forex account "to invest in certain foreign currencies as long-term retirement investments, not for day-trading or speculative purposes." (*Id.*) To that end, Plaintiff maintained Mexican pesos (MXN) and Russian rubles (RUB) in his account. (*Id.* ¶¶ 1-3.) As of January 30, 2024, Plaintiff held $160,000 worth of pesos and $160,000 worth of rubles. (*Id.* ¶ 3.) Based on his open foreign currency positions at the time, Plaintiff was required to maintain a margin requirement of $48,078, and he had $227,615 in available trading resources.[4]

---

[1]  On a motion to dismiss under Rule 12(b)(6), the Court must accept all facts as true, but courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and quotations omitted).

[2]  "Currency traders buy and sell currencies through forex transactions based on how they expect currency exchange rates will fluctuate. When the value of one currency rises relative to another, traders will earn profits if they purchased the appreciating currency, or suffer losses if they sold the appreciating currency." U.S. Sec. & Exch. Comm'n, *Foreign currency exchange (forex)*, Investor.gov (last visited Jan. 9, 2025), https://www.investor.gov/introduction-investing/investing-basics/glossary/foreign-currency-exchange-forex

[3]  StoneX Group is a publicly traded Delaware corporation with its principal place of business in New York. (ECF No. 11.)

[4]  According to the U.S. Securities and Exchange Commission, "[i]t is common in most forex trading strategies to employ leverage," which "entails using a relatively small amount of capital to buy currency worth many times the value of that capital." U.S. Sec. & Exch. Comm'n, *Foreign Currency Exchange (Forex) Trading For Individual Investors* (July 20, 2011),

(*Id.* ¶ 3.) Plaintiff alleges he was in the habit of maintaining "more than enough trading resources" in his account to be able to respond to changes in the market. (*Id.* ¶ 8.) Over the course of the next year, Plaintiff continued to purchase pesos and rubles "when their price was relatively low." (*Id.* ¶ 3.)

On January 24, 2022, the Russian Central Bank temporarily halted foreign currency purchases due to a "dramatic" decrease in the value of the ruble as compared to the U.S. dollar (USD). (*Id.* ¶ 4.) Plaintiff was not concerned by this development because he knew the value of the ruble "would come back up sooner or later." (*Id.*) Thus, Plaintiff purchased an additional $20,000 of rubles in February 2022, bringing his total holding to $300,000 of rubles. (*Id.* ¶ 5-7.) Plaintiff also continued to purchase Mexican pesos, bringing his total to $210,000 in February 2022. (*Id.* ¶ 7.)

On February 26, 2022, Plaintiff received an email from GAIN Capital containing a "friendly warning to customers trading in USD/RUB"[5] that "[d]ue to the evolving Russia/ Ukraine conflict" it expected a "heightened risk of price gapping at the Sunday market open." (*Id.* ¶ 8.) The email reminded customers of their responsibility to "monitor[] [their accounts] and maintain[] 100% of the required margin at all times to support [their] positions." (*Id.*) Plaintiff, however, was not alarmed by this warning, stating that he had been closely monitoring the USD/RUB price since "the day Russia launched its special military operation against Ukraine." (*Id.*) Moreover, in

---

https://www.sec.gov/investor/alerts/forextrading.pdf.  This "magnifies minor fluctuations in currency markets in order to increase potential gains and losses." *Id.*

[5]   "Forex transactions are quoted in pairs of currencies (e.g., [USD/RUB]) because [investors] are purchasing one currency with another currency." U.S. Sec. & Exch. Comm'n, *Foreign Currency Exchange (Forex) Trading For Individual Investors*, Investor.gov (July 20, 2011), https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins/foreignA.

the event of a rapid decline in the price of the ruble, Plaintiff planned to sell some or all of his pesos to "buy more rubles at or near the bottom of the market." (*Id.*)

Plaintiff alleges that he has engaged in foreign currency trading from the 1990s to the present day, and that he has "never panicked and sold large amounts of any foreign currency when its price was low or declining." (*Id.* ¶ 9.) Plaintiff's "decades-old" strategy is to buy when the price of the foreign currency is low and sell when it is high. (*Id.*) Plaintiff therefore "viewed the precipitous decline in the value of the ruble compared to the dollar as the opportunity [he] had been waiting for since opening his account" because Russia "was and is an extremely well-managed and economically sound and resilient country." (*Id.*) Plaintiff alleges he believed the U.S. dollar "was and is grossly overvalued" and that he wanted to establish positions in Mexican pesos and Russian rubles "so that [his] retirement savings would not lose most of their value when (not if) the value of the [U.S.] dollar crashes." (*Id.*)

In the time between receiving GAIN Capital's email warning about price volatility in the ruble and March 10, 2022, Plaintiff intentionally maintained the required margin of trading resources in his account, and he claims that he has "never been close to having insufficient margin." (*Id.* ¶¶ 10-13.)

On March 10, 2022, Plaintiff received an email from GAIN Capital notifying him that "[f]ollowing recent market volatility and global events" it would be "closing all open positions" in Russian rubles "due to diminishing liquidity." (*Id.* ¶ 14.) Upon receipt of GAIN Capital's email, Plaintiff alleges he emailed Rabih Massie—who Plaintiff understood to be his FOREX.com broker[6]—to object to GAIN Capital's plan to sell off his rubles. (*Id.*) Plaintiff characterized the

---

[6] Plaintiff claims he later learned that Massie was not his broker and was not employed by GAIN Capital when Plaintiff reached out to him regarding the closing of his USD/RUB position. (ECF No. 1 ¶ 14.)

4

sale of his USD/RUB positions as "grand larceny" and "against [his] will," and asked for GAIN Capital's legal department to contact him. Plaintiff further requested an exception from the forced liquidation. (*Id.*) Upon receiving an automatic response from Massie's email, Plaintiff forwarded the email chain to Emanuel Shalom, who was identified in Massie's automatic response as the correct person to reach out to for "immediate assistance." (*Id.* ¶ 15.) Shalom responded to Plaintiff and scheduled a call for the next day. (*Id.*)

On the morning of March 11, 2022, Plaintiff spoke with Shalom via telephone. (*Id.* ¶ 16.) Plaintiff first confirmed that Shalom was not a lawyer, and then stated, "I'm not either, but I believe that what [GAIN Capital] is about to do to me constitutes fraud" because GAIN Capital was "forcing [him] to sell all of [his] Russian rubles at a huge loss, against [his] will, for no valid reason." (*Id.*) Plaintiff alleges Shalom explained that the market for rubles was extremely illiquid and that GAIN Capital had the right to close all open positions in USD/RUB "for the protection of its customers" at 5:00 pm eastern time. (*Id.* ¶ 17.) According to Plaintiff, Shalom explained that GAIN Capital's subcontractors were having difficulty obtaining rubles. (*Id.*)

While on the call with Shalom, Plaintiff offered to "sign a contract with [GAIN Capital] stating that [he] will not sell any rubles for a period of 12 months." (*Id.* ¶ 19.) Plaintiff told Shalom that this would "eliminate all risk to [GAIN Capital]" because Plaintiff "kn[e]w for certain that the value of the ruble [wa]s going to go back up." (*Id.* ¶ 19.) Shalom reportedly countered that he was not on the call with Plaintiff to make a deal, but rather to explain that GAIN Capital had the right to close any open ruble positions. (*Id.* ¶ 20.) Plaintiff again objected and stated that he considered GAIN Capital's plan "criminal." (*Id.* ¶ 21.)

Plaintiff then asked Shalom whether other customers' USD/RUB positions were also being closed, but Shalom refused to provide any information, citing customer confidentiality concerns.

5

(*Id.* ¶¶ 21-22.)  Plaintiff also asked to speak with Shalom's boss, but Shalom refused, allegedly stating that "[m]y boss doesn't talk with individual investors." (*Id.* ¶ 22.)  Plaintiff next asked Shalom whether he thought the USD/RUB market would "remain illiquid forever," to which Shalom allegedly responded that "[t]hey don't pay me to think.  That's not my job." (*Id.*)  Finally, Plaintiff asked to speak with a lawyer in GAIN Capital's legal department. (*Id.* ¶ 23.)  Shalom allegedly told Plaintiff that he would "convey [Plaintiff's] position to [GAIN Capital's] legal department" who "might email" Plaintiff. (*Id.* ¶ 23.)

Later that day, Plaintiff received another email from GAIN Capital, which stated that it was closing any open ruble positions "to protect [its] customers and the firm from the unprecedented disruption in the [ruble] market." (*Id.* ¶ 24.)  The email further emphasized that GAIN Capital was not "attempting to benefit from these unfortunate circumstances," as the positions would be "closed at a mid-point price." (*Id.*)  Plaintiff interpreted this email as a way for GAIN Capital to "cover their rear ends" in the event of a lawsuit. (*Id.*)  That evening, GAIN Capital liquidated Plaintiff's open USD/RUB positions, which totaled 22,475,831 Russian rubles. (*Id.* ¶ 25.)

Plaintiff seeks relief in the form of 22,475,831 Russian rubles, opportunity cost damages, punitive damages of at least $4,000,000.00, declaratory relief, and injunctive relief to prohibit the Defendants from defrauding Plaintiff or any other investors in the same manner.[7] (*Id.* ¶ 27.)

---

[7]   The Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and Plaintiff seeks damages exceeding $75,000. (*See* ECF No. 26 (noting that Plaintiff is a citizen of Kentucky and Defendants are citizens of New Jersey, Delaware, and New York).)

### B. Procedural Background

Plaintiff filed his Complaint on January 29, 2024. (ECF No. 1.) Plaintiff's Complaint does not clearly set forth a cause of action, but the Court understands Plaintiff to be asserting a claim for common law fraud. (*See id.* ¶ 2 ("In general, fraud is a civil tort. When this case gets to trial, I will ask the jury to grant me actual damages of 22,475,831 Russian rubles, lost opportunity (opportunity cost) damages, punitive damages of at least $4,000,000, declarative relief, and injunctive relief to prevent the Defendants from robbing, defrauding and/or cheating me or any other investor again in the same outrageous way"); ECF No. 1-3 (denoting "nature of suit" on Civil Cover Sheet as "Other Fraud"); *see also* ECF No. 18 at 9[8] ("There is a big difference between the phrase, 'a breach of contract claim' and the word 'fraud.' I simply have never filed a breach of contract claim against the Defendants.").)

On April 12, 2024, Defendants moved to dismiss the Complaint. (ECF No. 17.) Following briefing by the parties, the Court directed Defendants to file a diversity disclosure statement in accordance with Rule 7.1(a)(2). (ECF No. 22.) On November 25, 2024, Defendants filed their diversity disclosure statement listing Defendants StoneX Group and GAIN Capital as citizens of Delaware and New York. Due to the apparent lack of connection to New Jersey, on November 26, 2024, the Court issued an Order to Show Cause directing Plaintiff to set forth why this matter should not be transferred to a more appropriate venue. (ECF No. 24.) Defendants then filed a revised diversity disclosure statement listing GAIN Capital as a citizen of Delaware and New Jersey. Further, Defendants filed a letter requesting that the matter remain in this district, arguing that the investment account at issue in the case was serviced by Defendants out of Warren, New

---

[8] Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

Jersey. (ECF No. 25.) On December 10, 2024, Plaintiff responded that he did not object to the matter being transferred to a different district, although he did not note a preference for any particular district. (ECF No. 29.) At this time, the Court will decline to *sua sponte* transfer the case to another district and will instead turn to the merits of Defendants' Motion to Dismiss.

II.     **LEGAL STANDARD**

On a motion to dismiss for failure to state a claim, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Dir. of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)). When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 903 (3d Cir. 2021)). The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis*, 824 F.3d at 349).

For claims of fraud, plaintiffs "must satisfy the heightened pleading standards of Federal Rule of Civil Procedure 9(b)." *Burns v. Stratos*, 2023 WL 4014474, at *2 n.3 (3d Cir. June 15, 2023) (citing *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)). This ordinarily requires "[a] plaintiff alleging fraud . . . [to] support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who,

what, when, where and how of the events at issue.'" *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)). "Rule 9(b)'s 'normally rigorous particularity rule has been relaxed somewhat where the factual information is particularly within the defendant's knowledge or control.' But even if a relaxed application of Rule 9(b) were warranted . . ., [a plaintiff] would still need to allege facts demonstrating that his [or her] fraud claims are plausible." *Tripati v. Wexford Health Sources Inc.*, 2022 WL 17690156, at *2 n.3 (3d Cir. Dec. 15, 2022) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997)).

Plaintiff is proceeding *pro se* and "[t]he obligation to liberally construe a pro se litigant's pleadings is well-established." *Higgs v. Att'y Gen. of the United States*, 655 F.3d 333, 339 (3d. Cir 2011) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)). "Courts are to construe complaints so as to do substantial justice, keeping in mind that *pro se* complaints in particular should be construed liberally." *Alston v. Parker*, 363 F.3d 229, 234 (3d Cir. 2004) (citing Fed. R. Civ. P. 8(f)). "Liberal construction does not, however, require the Court to credit a *pro se* plaintiff's 'bald assertions' or 'legal conclusions.'" *Grohs v. Yatauro*, 984 F. Supp. 2d 273, 282 (D.N.J. 2013) (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)). "[P]ro se litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013). And, "*[p]ro se* plaintiffs are also not exempt from meeting the heightened pleading requirements of Rule 9(b) when alleging claims that sound in fraud." *Kaul v. Christie*, 372 F. Supp. 3d 206, 229 (D.N.J. 2019).

"Even a *pro se* complaint may be dismissed for failure to state a claim if the allegations set forth by the plaintiff cannot be construed as supplying facts to support a claim entitling the plaintiff

9

to relief." *Grohs*, 984 F. Supp. 2d at 282 (citing *Milhouse v. Carlson*, 652 F.2d 371, 373 (3d Cir. 1981)).

**III.   DISCUSSION**

Defendants argue that Plaintiff's Complaint must be dismissed because: (1) Defendants' exercise of rights provided to them by contract under the Customer Agreement[9] entered into by Plaintiff when he registered his FOREX.com account does not constitute fraud; (2) Plaintiff does not allege that he was fraudulently induced into signing the Customer Agreement, and therefore his fraud claim is barred by the economic loss doctrine; and (3) Plaintiff does not sufficiently allege fraud under the heightened pleading standard of Rule 9(b). (*See* ECF No. 17-1 at 19-26.) The Court agrees with Defendants' third point—that Plaintiff fails to state a claim for common law fraud, and it will therefore dismiss the Complaint on that basis without reaching Defendants' other arguments.

---

[9]   Defendants urge the Court to consider the Customer Agreement attached as Exhibit A to their Motion to Dismiss. (ECF No. 17-1 at 1; ECF No. 17-2.) "[A] court cannot consider matters extraneous to the pleadings on a motion to dismiss unless the document in question is 'integral to or explicitly relied upon in the complaint[.]'" (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997))). The rationale for this exception is to "prevent . . . the situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426. In this case, Plaintiff has not brought a breach of contract claim, nor has he referenced a single provision of the Customer Agreement. (*See generally* ECF No. 1.) Moreover, Defendants do not cite any cases taking such a broad reading of the extraneous document exception. (*See* ECF No. 17 at 10 n.1 (citing *Blair v. Fed. Pac. Credit Co., LLC*, 563 F. Supp. 3d 347, 354 (D.N.J. 2021) (considering a letter that Plaintiff attached to her complaint) and *Schmidt v. Skolas*, 770 F.3d 241, 250 (3d Cir. 2014) (declining to consider press releases that the plaintiff neither attached to nor relied upon in his complaint)).) Therefore, the Court will not consider the Customer Agreement at this stage.

As previously noted, the Court construes Plaintiff as bringing a common law fraud claim. To make out a common law fraud claim under New Jersey law,[10] a plaintiff must allege: (1) a material misrepresentation or omission of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance; and (5) damages. *Stockroom, Inc. v. Dydacomp Dev. Corp.*, 941 F. Supp. 2d 537, 546 (D.N.J. 2013) (citing *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997)).

Even construing Plaintiff's Complaint liberally,[11] and drawing all reasonable inferences in his favor, the Court finds that Plaintiff has not plausibly stated a claim for common law fraud under New Jersey law because Plaintiff has failed to point to any material misrepresentation or omission. (*See generally* ECF No. 1.) To the contrary, the core of Plaintiff's Complaint is that: (1) GAIN Capital informed Plaintiff that it would liquidate his USD/RUB positions; (2) Plaintiff strenuously objected to GAIN Capital doing so; and (3) GAIN Capital liquidated his positions anyway. (ECF No. 1 ¶¶ 14-25.) Accepting these allegations as true, the Court finds that the Complaint fails to plausibly allege any misrepresentation or omission, and thus fails to state a claim for common law fraud. Although Plaintiff details his conversation with an employee of GAIN Capital, he does not allege that the employee (or anyone else) made any false statements. (*See* ECF No. 1 ¶¶ 16-26.) *See Barbee v. Amira Nature Foods, Ltd.*, Civ. No. 21-12894, 2023 WL 4627744, at *3 n.3, *15

---

[10] There does not appear to be a dispute that New Jersey law applies to Plaintiff's common law fraud claim. (*See* ECF No. 17-2 at 5; *see generally* ECF No. 18.)

[11] A *pro se* plaintiff's complaint is held to less stringent standards than one drafted by an attorney. *Crown Bay Marina, Inc.*, 704 F.3d at 244. However, a *pro se* plaintiff still must sufficiently allege that he is entitled to relief and is not absolved of federal pleading requirements. *Thakar v. Tan*, 372 F. App'x 325, 328 (3d Cir. 2010). Further, the "mere possibility of misconduct" does not show that the "pleader is entitled to relief." *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009).

(D.N.J. July 19, 2023) (dismissing common law fraud claim where the *pro se* plaintiff did not allege that that the defendant's statements were "false when made.").

Plaintiff's arguments in opposition to Defendants' Motion to Dismiss do not persuade the Court to reach a different result. In much of his brief, Plaintiff merely restates the allegations in his Complaint verbatim. (*See* ECF No. 18 at 2-6.) And in response to Defendants' argument that he has not stated a claim for common law fraud, Plaintiff asserts that he was "never required to show that the Defendants knew that the representations of material fact were false or that they had the intent to deceive [him]." (*Id.* at 9.) Plaintiff claims that is so, without citing any authority, because "[i]t is possible to steal someone's money without deceiving them, and that is exactly what the Defendants did." (*Id.*)

Lacking any allegation of a material misrepresentation or omission on the part of Defendants, Plaintiff's Complaint does not state a claim for common law fraud. *See Tadros v. City of Union City*, Civ. No. 10-2535, 2011 WL 1321980, at *9 (D.N.J. Mar. 31, 2011) (finding that the plaintiff failed to state a common law fraud claim where there were no allegations that the defendant "intentionally misrepresented facts" and where the plaintiff did not "claim with any particularity any injury stemming from any alleged fraudulent misrepresentation of facts"); *Stone v. Prudential Fin., Inc.*, Civ. No. 21-14610, 2021 WL 5413989, at *2 (D.N.J. Nov. 19, 2021) (dismissing common law fraud claim where the plaintiff did not identify "what was materially misleading or false about" statements made by the defendant's representatives); *Am. Corp. Soc. v. Valley Forge Ins. Co.*, Civ. No. 09-5568, 2010 WL 2950367, at *4 (D.N.J. July 22, 2010), *aff'd*, 424 F. App'x. 86 (3d Cir. 2011) (dismissing complaint that "allege[d] no such specific misrepresentations" made by the defendants).

Plaintiff's Complaint is therefore dismissed without prejudice for failure to state a claim for common law fraud with particularity. *See* Fed. R. Civ. P. 9(b); *see also Kaplan v. Gen. Elec. Co.*, 22-05296, 2023 WL 4288157, at *7 (D.N.J. June 30, 2023) ("Rule 9(b) requires plaintiffs to support their 'allegations "with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue."'")

## IV.   CONCLUSION

For the foregoing reasons, and other good cause shown, Defendants' Motion to Dismiss (ECF No. 17) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED** without prejudice. To the extent that Plaintiff can cure the deficiencies outlined above, he may file an amended complaint within thirty days. An appropriate Order follows.

Dated: January 13, 2025

*/s/ Georgette Castner*
GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE